LEWIS & LLEWELLYN LLP
    Marc R. Lewis (Bar No. 233306)
    Ryan B. Erickson (Bar No. 268239)
505 Montgomery Street, Suite 1300
San Francisco, California 94111
Telephone: (415) 800-0590
Facsimile: (415) 390-2127
Email:    mlewis@lewisllewellyn.com
              rerickson@lewisllewellyn.com

BECK REED RIDEN LLP
    Russell Beck (*pro hac vice* application pending)
    Stephen D. Riden (*pro hac vice* application pending)
155 Federal Street, Suite 1302
Boston, MA 02110
Telephone: (617) 500-8660
Facsimile: (617) 500-8665
Email:    rbeck@beckreed.com
              sriden@beckreed.com

Attorneys for Plaintiff Fidelity Brokerage Services LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIDELITY BROKERAGE SERVICES LLC, | CASE NO. 4:17-cv-04993-PJH |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FIDELITY'S MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| BRETT ROCINE and J.P. MORGAN SECURITIES LLC, | |
| Defendants. | Complaint Filed: August 28, 2017 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................... 1

STATEMENT OF FACTS ................................................................. 2

    A.    Fidelity Creates And Maintains Strong Customer Relationships. ................... 2

    B.    Fidelity's Business Depends On Its Trade Secret Customer Data. ................. 3

    C.    Fidelity Takes Reasonable Steps To Keep Its Data Confidential.................... 3

    D.    Rocine Acquired Fidelity's Trade Secret Customer Information Subject To His Agreement To Protect And Return It At The End Of His Employment. . 4

    E.    Fidelity Reminded Rocine To Preserve Fidelity's Trade Secret Customer Information At The Time Of His Termination. ................................................ 6

    F.    Rocine Misappropriated And Used Fidelity's Trade Secret Customer Information To Solicit Fidelity Customers On Behalf Of JPMorgan. ............. 6

    G.    Fidelity Faces The Threat Of Immediate And Irreparable Harm Stemming From Defendants' Conduct. ................................................................. 9

LEGAL ARGUMENT ....................................................................... **9**

I.    THE STANDARDS FOR GRANTING TEMPORARY INJUNCTIVE RELIEF STRONGLY FAVOR GRANTING FIDELITY RELIEF........................................ 11

II.    FIDELITY HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS. ... 12

    A.    Defendants Misappropriated Fidelity's Trade Secret Customer Information. 12

        1.    Fidelity's Client Information Is A Trade Secret................................ 13

        2.    Defendants Misappropriated Fidelity's Trade Secrets. ..................... 15

        3.    Rocine Did More Than Announce; He Solicited Multiple Clients. ... 15

    B.    Rocine Breached The Employment Agreement. ........................................... 16

III.    FIDELITY IS SUFFERING IRREPARABLE HARM AS A RESULT OF DEFENDANTS' WRONGFUL AND ONGOING ACTS. ...................................... 17

IV.    THE EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR GRANTING THE REQUESTED INJUNCTIVE RELIEF. ..................................... 18

LEWIS +
LLEWELLYN
LLP

A.  The Balance Of Equities Tips Strongly In Favor Of Fidelity. ........................ 18

B.  The Public Interest Will Be Served By Granting Injunctive Relief. .............. 18

V.  A TRO WILL MAINTAIN THE *STATUS QUO* PENDING ARBITRATION. ........ 19

VI.  THIS COURT MAY ENTER INJUNCTIVE RELIEF EVEN THOUGH THE

MERITS WILL BE DECIDED IN ARBITRATION. ................................................ 20

VII.  THERE IS NO NEED FOR A BOND. ....................................................................... 20

**CONCLUSION** ............................................................................................................... **21**

LEWIS +
LLEWELLYN
LLP

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) ...................................................................... 11

*Bank of Am., N.A. v. Immel*,
    No. C 10-02483, 2010 WL 2380877 (N.D. Cal. June 11, 2010) .............................. 17, 19

*Bank of Am., N.A. v. Lee*,
    No. CV 08-5546, 2008 WL 4351348 (C.D. Cal. Sept. 22, 2008) ................................. 19

*Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    910 F.2d 1049 (2d Cir. 1990) ...................................................................... 20

*Courtesy Temp. Serv., Inc. v. Camacho*,
    222 Cal. App. 3d 1278 (1990) ................................................................. 14, 15

*Deck v. Wells Fargo Bank, N.A.*,
    No. 17-cv-00234, 2017 WL 659945 (E.D. Cal. Feb. 13, 2017) ................................. 11

*Fidelity Brokerage Servs. v. Alexopoulos*,
    Case No. 03-5362 (Mass. Super. 2003) ........................................................ 11

*Fidelity Brokerage Servs. v. Busch, et al.*,
    Case No. 14-10756 (E.D. Mich. Mar. 7, 2014) ................................................ 10

*Fidelity Brokerage Servs. v. Clemens*,
    Case No. 2:13-CV-239 (E.D. Tenn. Nov. 4, 2013) ............................................ 10

*Fidelity Brokerage Servs. v. Djelassi, et al.*,
    Case No. 2015-2337-BLS1 (Mass. Super. Aug. 11, 2015) ................................... 10

*Fidelity Brokerage Servs. v. Donovan*,
    Case. No. 03-2286 (Mass Super. 2003) ....................................................... 11

*Fidelity Brokerage Servs. v. Downey*,
    Case No. 08-1637 (JFB) (E.D.N.Y. April 28, 2008) .......................................... 11

*Fidelity Brokerage Servs. LLC v. Fassenfeld*,
    Case No. 013945/11 (NY Sup. Ct. Sept. 28, 2011) .......................................... 10

*Fidelity Brokerage Servs. LLC v. Franz*,
    Case No. 8/9564 (NY Sup. Ct. May 7, 2008) ................................................. 11

*Fidelity Brokerage Servs. LLC v. Hoffman*,
    Case No. 1:17-CV-2831 (N.D. Ill. Apr. 19, 2017) ........................................... 10

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
FIDELITY'S MOTION FOR TEMPORARY RESTRAINING ORDER

*Fidelity Brokerage Servs. v. Hudson*,
    Case No. 4:14-cv-03229 (S.D. Tex. Nov. 18, 2014) .................................................... 10

*Fidelity Brokerage Servs. v. Johnson*,
    Case No. A04-CA-662-SS (W.D. Tex. 2004) .................................................... 11

*Fidelity Brokerage Servs. v. Jones*,
    Case. No. 04-3478 (S.D. Tex. 2004) .................................................... 11

*Fidelity Brokerage Servs. LLC v. McNamara*,
    No. 11-1092, 2011 WL 2117546 (S.D. Cal. May 27, 2011) .................................... *passim*

*Fidelity Brokerage Servs. LLC v. Moore*,
    Case No. 2015-609-BLS1 (Mass. Super. Mar. 18, 2015) .................................................... 10

*Fidelity Brokerage Servs. LLC v. Nordstrom*,
    Case No. 17-0594 (E.D. Cal. Mar. 30, 2017) .................................................... 10, 12, 17

*Fidelity Brokerage Servs. v. Parker*,
    Case No. 04-1027 (S.D. Cal. 2004) .................................................... 11

*Fidelity Brokerage Servs. v. Rousseaux*,
    Case No. 03-01319 (D. Md. 2003) .................................................... 11

*Fidelity Brokerage Servs. v. Rupp*,
    Case No. 05-00083 (D.N.H. 2005) .................................................... 11

*Fidelity Brokerage Servs. LLC v. Sanchez*,
    Case No. 08-03863 (C.D. Cal. 2008) .................................................... 10

*Fidelity Brokerage Servs. v. Stockwell*,
    Case No. 05-0455 (Mass. Super. 2005) .................................................... 11

*Fidelity Brokerage Servs. v. Umstead*,
    Case No. 07-347 (E.D. Va. 2007) .................................................... 11

*Fidelity Brokerage Servs. v. Vance*,
    Case No. 07-1230 (C.D. Cal. 2007) .................................................... 11

*Fidelity Brokerage Servs. LLC v. Wilder*,
    Case No. 11-37296 (Mass. Super. Oct. 25, 2011) .................................................... 10

*Fidelity Global Brokerage Grp. v. Beatty*,
    Case No. 652147 (NY Sup. Ct. Dec. 6, 2010) .................................................... 10

*Fidelity Global Brokerage Grp. v. Gray*,
    Case No. 10-1255 (E.D. Va. Nov. 9, 2010) .................................................... 10

*Gable-Leigh, Inc. v. N. Am. Miss*,
    No. 01-01019, 2001 WL 521695 (C.D. Cal. Apr. 13, 2001) .................................................... 13

LEWIS +
LLEWELLYN
LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
FIDELITY'S MOTION FOR TEMPORARY RESTRAINING ORDER

*Gallagher Benefit Servs., Inc. v. De La Torre,*
  283 Fed. App'x. 543 (9th Cir. 2008) ............................................................ 17

*Henry Schein, Inc. v. Cook,*
  191 F. Supp. 3d 1072 (N.D. Cal. 2016) .................................................. *passim*

*Jorgensen v. Cassiday,*
  320 F.3d 906 (9th Cir. 2003) ....................................................................... 20

*MAI Sys. Corp. v. Peak Computer, Inc.,*
  991 F.2d 511 (9th Cir. 1993) ....................................................................... 14

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley,*
  756 F.2d 1048 (4th Cir. 1985) ..................................................................... 20

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chung,*
  No. 01-659, 2001 WL 283083 (C.D. Cal. Feb. 2, 2001) ......................... *passim*

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dutton,*
  844 F.2d 726 (10th Cir. 1988) ..................................................................... 20

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Garcia,*
  127 F. Supp. 2d 1305 (C.D. Cal. 2000) ................................................. 12, 14

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty,*
  808 F. Supp 1555 (S.D. Fla. 1992), *aff'd,* 2 F.3d 405 (11th Cir. 1993) (per curiam) ..... 20

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kramer,*
  816 F. Supp. 1242 (N.D. Ohio 1992) ........................................................... 19

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano,*
  999 F.2d 211 (7th Cir. 1993) ....................................................................... 20

*Morlife, Inc. v. Perry,*
  56 Cal. App. 4th 1514 (1997) ........................................................... 13, 19, 20

*Ortho Pharm. Corp. v. Amgen Inc.,*
  887 F.2d 460 (3d Cir. 1989) ........................................................................ 20

*Peabody Coalsales Co. v. Tampa Elec. Co.,*
  36 F.3d 46 (8th Cir. 1994) ........................................................................... 20

*Performance Unlimited, Inc. v. Questar Publishers, Inc.,*
  52 F.3d 1373 (6th Cir. 1995) ....................................................................... 20

*PMS Distrib. Co. v. Huber & Suhner, A.G.,*
  863 F.2d 639 (9th Cir. 1988) ....................................................................... 20

*Pyro Spectaculars N., Inc. v. Souza,*
  861 F. Supp. 2d 1079 (E.D. Cal. 2012) ................................................. *passim*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
FIDELITY'S MOTION FOR TEMPORARY RESTRAINING ORDER

LEWIS +
LLEWELLYN
LLP

*Reeves v. Hanlon*,
    33 Cal. 4th 1140 (2004) ............................................................................... 12, 15

*Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    777 F. Supp. 1349, *aff'd*, 948 F.2d 1286 (5th Cir. 1991) ............................... 20

*Sana v. Hawaiian Cruises, Ltd.*,
    181 F.3d 1041 (9th Cir. 1999) ............................................................................ 7

*Silicon Image, Inc. v. Analogix Semiconductor*,
    642 F. Supp. 2d 957 (N.D. Cal. 2008) ............................................................. 16

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ........................................................................... 17

*Teradyne Inc. v. Mostek Corp.*,
    797 F.2d 43 (1st Cir. 1986) .............................................................................. 20

*Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire of N. Am., Inc.*,
    609 F.3d 975 (9th Cir. 2010) ........................................................................... 11

*Walczak v. EPL Prolong, Inc.*,
    198 F.3d 725 (9th Cir. 1999) ........................................................................... 20

*Wyndham Resort Dev. Corp. v. Bingham*,
    No. 2:10-CV-01556, 2010 WL 2740158 (E.D. Cal. July 9, 2010) ................... 12

**Statutes and Rules**

18 U.S.C. § 1836 (West 2017) .......................................................................... 10, 12

18 U.S.C. § 1839 (West 2017) .......................................................................... 12, 15

15 U.S.C. § 6801(a) (2012) ................................................................................. 4, 13

Cal. Civ. Code § 3426.1 (West 2017) ............................................................... 12, 15

Cal. Civ. Code § 3426.2 (West 2017) ..................................................................... 12

Federal Rule of Civil Procedure 65 ..................................................................... 1, 20

Federal Rule of Evidence 803(6) .............................................................................. 7

Local Rule 65-1 ......................................................................................................... 1

**Other Authorities**

17 C.F.R. §§ 248.1, *et. seq.* (2017) .......................................................................... 4

17 C.F.R. § 248.3 (2017) ......................................................................................... 13

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
FIDELITY'S MOTION FOR TEMPORARY RESTRAINING ORDER

LEWIS +
LLEWELLYN
LLP

17 C.F.R. § 248.10 (2017) .................................................................................................. 13

FINRA Rule 13200 ............................................................................................................... 1

FINRA Rule 13804 .......................................................................................................... 1, 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LEWIS +
LLEWELLYN
LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
FIDELITY'S MOTION FOR TEMPORARY RESTRAINING ORDER

# INTRODUCTION

Plaintiff Fidelity Brokerage Services LLC ("Fidelity") respectfully moves this Court for a temporary restraining order ("TRO") (without security) against Defendants Brett Rocine ("Rocine") and J.P. Morgan Securities LLC ("JPMorgan") pursuant to Fed. R. Civ. P. 65 and Civil L.R. 65-1. Injunctive relief is necessary to prevent irreparable harm to Fidelity and to maintain the *status quo* pending FINRA arbitration.

This case arises from the unfair competition engaged in against Fidelity by one of its former employees, Rocine, a Financial Consultant, and his new employer, JPMorgan. As described in more detail more below and in Fidelity's supporting materials, Rocine resigned from Fidelity effective July 20, 2017 and almost immediately began soliciting Fidelity's clients on behalf of JPMorgan using Fidelity's trade secrets and other confidential customer information. Despite Fidelity's efforts to resolve this matter without resorting to litigation, Rocine ignored those efforts and, instead, secretly continued to solicit Fidelity's clients using Fidelity's confidential customer information, while JPMorgan provided cover through false assurances.

The parties are subject to the arbitration rules and regulations of the Financial Industry Regulatory Authority ("FINRA"). *See* FINRA Rule 13200. Accordingly, concurrent with filing this Motion for TRO ("Motion"), Fidelity has filed a Statement of Claim with FINRA seeking binding arbitration of this dispute pursuant to Rule 13804(a)(2). Although the merits of this case will be resolved in an arbitration before FINRA, pursuant to FINRA Rule 13804, Fidelity is required to seek and obtain immediate injunctive relief in a court of competent jurisdiction before an expedited FINRA arbitration may proceed. If this Court issues a TRO, FINRA can schedule an expedited arbitration within fifteen (15) days of entry of the TRO. If no TRO is issued, however, FINRA cannot hear this case on an expedited basis and, instead, must assign it to a standard-track arbitration, which could delay a hearing on the merits for a year or more. Immediate injunctive relief is therefore needed to preserve the *status quo* while the parties proceed to expedited arbitration.

/ / /

/ / /

/ / /

LEWIS +
LLEWELLYN
LLP

**STATEMENT OF FACTS**

    **A.**      **Fidelity Creates And Maintains Strong Customer Relationships.**

       Fidelity and its affiliates provide a wide range of financial services – such as retirement services, investment planning, wealth management, securities execution and clearing, life insurance services, and equity services – to customers, with whom Fidelity typically enjoys significant, long-term relationships.  Declaration of Paul Peterson ("Peterson Decl."), ¶ 2.  Fidelity also offers individual investors a broad suite of trading and cash management features, including buying and selling stocks, bonds, options, and over 10,000 mutual funds from Fidelity and other well-known fund companies.  *Id.*  Critically, Fidelity is unique in the retail brokerage field because its Financial Consultants do not "cold call" people who have no relationship with Fidelity or who were not referred to Fidelity.  *Id.*, ¶ 3.  Rather, its Financial Consultants develop service relationships with customers based on leads that Fidelity provides from two sources.  *Id.*

       First, Fidelity provides its Financial Consultants leads based on individuals who have initiated contact with Fidelity by telephone, internet, or in person.  *Id.*, ¶ 4.  To that end, Fidelity and its affiliates devote tens of millions of dollars per year toward attracting customers to Fidelity's various businesses:  Fidelity advertises locally and nationally; maintains an interactive website; operates multiple call centers; and maintains prominent retail locations.  *Id.*  Fidelity invests significant time, labor, and capital in each of these platforms, which invite individuals to contact and establish relationships with Fidelity, and derives substantial business from these initial client contacts.  *Id.*

       Second, Fidelity refers its Financial Consultants to existing Fidelity customers when those clients experience "triggering events" (such as Fidelity 401(k) distributable events) that may lead to interest in Fidelity's retail financial services.  *Id.*, ¶ 5.  A Financial Consultant also may be assigned to a customer when the client's former consultant has moved, changed roles, or left Fidelity.  *Id.*  A large portion of Fidelity's business is derived from serving the needs of its existing customers.  *Id.*

       Financial Consultants, such as Rocine, serve as the face of Fidelity and are responsible for developing and sustaining customer relationships with their assigned clients.  *Id.*, ¶ 6.  Fidelity's lead-based approach to supporting its Financial Consultants distinguishes Fidelity from other full-

service brokerages, where individual brokers, rather than the firm, are responsible for establishing customer relationships. *Id.* Fidelity's success in its lead-based approach is based on the typically long-standing relationships it enjoys with its customers. *Id.*

**B.     Fidelity's Business Depends On Its Trade Secret Customer Data.**

The success of Fidelity's unique, lead-based approach is also directly tied to Fidelity's trade secret customer information, which is one of Fidelity's most valuable assets. *Id.*, ¶ 7. Fidelity's trade secret customer data comprises Fidelity's customers' names and contact information, as well as unique financial information relating to individual customers, such as financial statements, investment goals, investment history, assets, income, and net worth. *Id.* Although certain information might be publicly available – such as an individual's name or home telephone number – only a limited number of Fidelity employees know who, within the general public, are Fidelity customers and therefore have a specific need for investment services. *Id.* Fidelity has developed its confidential customer information through significant investment of time, labor, and capital. *Id.*

Accordingly, Fidelity derives substantial economic value from preserving its customer data as a trade secret. *Id.*, ¶ 8. Although individual customers may be periodically subject to random solicitations from Fidelity's competitors, no competitor can strategically target a known set of Fidelity customers and address their needs without access to Fidelity's trade secret customer data. *Id.* In other words, having access to the customer data Fidelity has compiled over years would provide a competitor with not only a playbook for which Fidelity customers to contact, but also invaluable insight into those customers' financial needs, which a competitor would not otherwise have. *See id.*, ¶¶ 8, 9. In this way, maintaining the confidentiality of Fidelity's trade secret customer data provides Fidelity with a significant competitive advantage over its competitors. *Id.*, ¶ 8. Moreover, Fidelity must keep (and does keep) its customer information confidential in order to meet customer expectations that it will maintain clients' sensitive, personally identifiable information (including their identity as a customer, contact information, and financial information) in confidence. Peterson Decl., ¶ 11; Declaration of Peter Van Bemmel ("Bemmel Decl."), 29.

**C.     Fidelity Takes Reasonable Steps To Keep Its Data Confidential.**

Fidelity vigilantly protects the secrecy of its trade secret customer information so that such

LEWIS +
LLEWELLYN LLP

data does not become available to competitors (who could use the information to divert Fidelity's customers without expending the same amount of time, labor, and capital that Fidelity invested in compiling the information).  Peterson Decl., ¶ 9.  Among other things, Fidelity:  does not provide the information to competitors; maintains the data on password-protected computers; and provides access to such data to only those employees who require the information to perform their roles.  *Id.*

Fidelity also has a Global Policy on Information Protection, which it keeps on its intranet. Peterson Decl., ¶ 9; Bemmel Decl., ¶ 6 & Ex. 1.  Fidelity advises, educates, and periodically reminds its employees about this policy.  Peterson Decl., ¶ 9; Bemmel Decl., ¶ 6.  Fidelity also provides employees with a Quick Reference Card, which explains how to protect specific types of Fidelity confidential information.  Bemmel Decl., ¶ 6 & Ex. 2.

Further, Fidelity requires each of its employees to execute a Fidelity Employee Agreement in which the employee agrees not to use or disclose Fidelity's confidential information, including Fidelity's customer information, outside of Fidelity.  Bemmel Decl., ¶¶ 8, 9; Peterson Decl., ¶ 9. Fidelity employees are not permitted to take, use, or disclose any customer information when they leave Fidelity.  Peterson Decl., ¶ 9.

Beyond safeguarding its valuable trade secret information, Fidelity is vigilant in protecting its customers' privacy because most Fidelity clients have not authorized Fidelity to share their contact or financial data outside of Fidelity.  Bemmel Decl., ¶ 7.  Indeed, Federal law requires Fidelity to prevent the disclosure of nonpublic customer information, including contact and financial information, to third parties.  *See* 15 U.S.C. §§ 6801 *et. seq.* (2012); 17 C.F.R. §§ 248.1 *et. seq.* (2017).

**D.**     **Rocine Acquired Fidelity's Trade Secret Customer Information Subject To His Agreement To Protect And Return It At The End Of His Employment.**

At the outset of his employment in 2012, Rocine signed an Employee Agreement as a condition of his initial and ongoing employment with Fidelity, which Fidelity requires of all its financial representatives.  *Id.*, ¶ 8 & Ex. 3.  Further, like all Fidelity employees, Rocine was also advised of Fidelity's Global Policy on Information Protection.  *Id.*, ¶ 6.

In his Employee Agreement, Rocine acknowledged the confidentiality of Fidelity's records,

including its customer lists and customer information. *Id.*, ¶ 9 & Ex. 3, ¶ 1. Accordingly, Rocine promised to use Fidelity's confidential information only in the course of his Fidelity employment and not to disclose Fidelity's confidential data to third parties. *Id.* Rocine also agreed that he would not, for one year following his separation from Fidelity use Fidelity's confidential information to "directly or indirectly, on [his] own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer or prospective customer of [Fidelity] to divert [business away from Fidelity]." *Id.*, Ex. 3, ¶ 6. Rocine acknowledged that any violation of the Employee Agreement would cause Fidelity irreparable harm and would entitle Fidelity to seek emergency injunctive relief to protect its confidential information. *Id.*, Ex. 3, ¶ 10.

As consideration for executing the Employee Agreement, Fidelity hired and continued to employ Rocine, compensated him throughout his employment, provided him with introductory and continuing on-the-job training, and gave him access to its confidential customer information (including information related to Fidelity's Private Client Group clients, who have higher net worth and investable assets) so that he could effectively perform his role at Fidelity. *Id.*, ¶ 10. Fidelity further provided Rocine with support services, marketing reporting services, research, sales assistance, access to and use of experts in asset management, tax, estate planning and insurance, and other support that enabled Rocine to succeed in his role at Fidelity. *Id.* Fidelity also registered Rocine with the New York Stock Exchange, FINRA, and the American Stock Exchange. *Id.*

At time of resignation, Rocine was a Financial Consultant at Fidelity's Larkspur, California investor center, responsible for servicing and managing Fidelity's customer relationships. *Id.*, ¶¶ 3, 4. Notably, many of Rocine's assigned clients belonged to Fidelity's Premium Services Group, which generally requires clients to have between $250,000 and $1 million or more in invested assets at Fidelity. *Id.* Further, Rocine also serviced clients with over $1 million in invested assets at Fidelity. *Id.* In order to service these clients, Rocine required and was provided access to their confidential personal, financial, and account information. *Id.*, ¶ 5. By the time he left Fidelity, Rocine had daily access to, and had gained intimate knowledge of, Fidelity's confidential information relating to approximately 972 clients (492 households), representing an excess of $844 million in assets. *Id.*

**E.** **Fidelity Reminded Rocine To Preserve Fidelity's Trade Secret Customer Information At The Time Of His Termination.**

Rocine separated from Fidelity effective Thursday, July 20, 2017. *Id.*, ¶ 3. Before Rocine left, Fidelity reminded Rocine of his confidentiality obligations to Fidelity during an in-person meeting. *Id.*, ¶ 12. Shortly after Rocine's termination, Fidelity sent Rocine a letter, again reminding him of such obligations. *Id.*, ¶ 14 & Ex. 4. Specifically, the letter advised Rocine that Fidelity "expect[s] that you returned all Company property . . . including [Fidelity's] Confidential Information." *Id.* The letter further stated that Fidelity's Confidential Information "consists of all information pertaining to the business of Fidelity or any of its affiliates that was not generally known to the public at the time made known to you. It includes but is not limited to . . . customer, prospect lists." *Id.* Fidelity also specifically instructed Rocine to return any such information immediately, and reminded him that he may not use or disclose that information. *Id.*

**F.** **Rocine Misappropriated And Used Fidelity's Trade Secret Customer Information To Solicit Fidelity Customers On Behalf Of JPMorgan.**

Shortly after his resignation, Fidelity learned that Rocine had accepted a position with JPMorgan, its direct competitor. *Id.*, ¶¶ 3, 13. Fidelity did not attempt to restrict Rocine from working for JPMorgan. *Id.*, ¶ 13. Beginning in late July, however, Fidelity began to receive reports that Rocine had been calling Fidelity's clients in effort to divert their accounts to JPMorgan. *Id.* The only way Rocine could have known the customers' identities and contact information was through Fidelity's trade secret and confidential customer information. *Id.*, ¶ 27.

Accordingly, on August 7, 2017, Fidelity sent a letter to Rocine indicating that it had reason to believe that he was soliciting Fidelity's customers using its confidential information. *Id.*, ¶ 15 & Ex. 5. Fidelity reminded Rocine of his confidentiality obligations and requested that Rocine return (and verify the return of) all Fidelity trade secret and other confidential information in his possession, and permanently delete all copies of the same remaining in his possession. *Id.* Fidelity's request was met with radio silence by Rocine. *Id.*, ¶ 16. Instead, JPMorgan responded to the letter on August 9, 2017, representing that "Mr. Rocine is aware of his obligations to Fidelity and understands that it is [JPMorgan's] expectation that he comply with those obligations. Mr. Rocine

LEWIS +
LLEWELLYN
LLP

assures us that he did not retain a client list or any other confidential documents or property from Fidelity." *Id.*, ¶ 16 & Ex. 6.

Despite Fidelity's letters and JPMorgan's assurances, however, Rocine continued, and still continues, to use Fidelity's confidential customer information to solicit Fidelity's clients. *Id.*, ¶ 17. Fidelity understands that Rocine has even asked at least one Fidelity customer to lunch, in an apparent attempt to woo the client. Bemmel Decl., ¶ 22 & Ex. 8; Declaration of Jess Perez ("Perez Decl."), ¶¶ 9 & Ex. 4. These reports strongly suggest that Defendants possess Fidelity's trade secret customer information and are using such data to try to divert Fidelity's business to JPMorgan. Bemmel Decl., ¶ 17.

Following Rocine's departure from Fidelity, to ensure the smooth transition of service, Fidelity employees contacted those Fidelity clients to whom Rocine had been previously assigned. Bemmel Decl., ¶ 18; Perez Decl., ¶ 4. In accordance with Fidelity's policies and practices, the employees documented their conversations with those customers in Salesforce.[1] Bemmel Decl., ¶ 19; Perez Decl., ¶ 5. Among other things, the representatives documented the following evidence of Defendants' unlawful use of Fidelity's confidential information to solicit Fidelity's customers:

) On or around July 31, 2017, Fidelity client GN[2] reported that Rocine had been calling him. In addition to announcing his new place of employment, Rocine said to the client "let's talk about moving" the client's relationship to JPMorgan. Perez Decl., ¶ 6 & Ex. 1.

) On or around August 4, 2017, Fidelity client AN reported that Rocine had contacted and solicited him to move his account to JPMorgan. The client told Fidelity that he felt that it was "unethical and unprofessional," for Rocine to use his personal information to solicit

---

[1] By Fidelity's policies and business practices, each time a Fidelity employee interacts with a customer, that employee is required to document the substance of his or her interaction onto one of Fidelity's customer relationship management ("CRM") platforms (Salesforce or Siebel). Bemmel Decl., ¶ 19. Fidelity treats such information as confidential. *Id.* In accordance with this business practice, the Fidelity employees who spoke with Rocine's formerly assigned Fidelity customers documented the substance of their discussions onto one of Fidelity's CRM platforms. Bemmel Decl., ¶¶ 19, 20; Perez Decl., ¶ 5. Accordingly, the reports – which are attached as exhibits to the Declarations of Jess Perez and Peter Van Bemmel – are admissible as business records. *See Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1046-47 (9th Cir. 1999) (business records maintained in the ordinary course of business are admissible evidence pursuant to Fed. R. Evid. 803(6)).

[2] Fidelity refers to its customers by their initials to protect client confidentiality.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
FIDELITY'S MOTION FOR TEMPORARY RESTRAINING ORDER

him from a different brokerage firm, and that the client was concerned about maintaining his privacy. Fidelity explained that Fidelity takes its customers' privacy very seriously and that it would work to get the issue resolved. *Id.*, ¶ 7 & Ex. 2.

⟩ On or around August 15, 2017, Fidelity client PS reported that Rocine had contacted and solicited him to move his business to JPMorgan. PS asked a Fidelity employee if Fidelity was losing many customers to Rocine at JPMorgan. Just two days later, on August 17, 2017, PS reported that Rocine had called him again earlier that day. *Id.*, ¶ 8 & Ex. 3.

⟩ On or around August 18, 2017, Fidelity client KM reported that Rocine had contacted him approximately two weeks prior and solicited the client to move his accounts to JPMorgan. The client also reported that Rocine had requested that they meet for lunch to discuss the details of moving KM's account to JPMorgan, and that they had scheduled a lunch for August 25, 2017. KM confirmed that he intended to attend the lunch with Rocine. Perez Decl., ¶ 9 & Ex. 4; *see* Bemmel Decl., ¶ 22 & Ex. 8.

⟩ On or around August 22, 2017, Fidelity client EC reported that Rocine had been leaving multiple messages about his new employment for her and her daughters (who are also Fidelity clients). EC stated that neither she nor her daughters had returned his calls. Perez Decl., ¶ 10 & Ex. 5.

⟩ On or around August 22, 2017, Fidelity client GP reported that Rocine had also left him a voicemail alerting him of Rocine's new brokerage firm and requesting that the client call Rocine back. The client told Fidelity that he felt that it was "unprofessional" that Rocine contacted him after leaving Fidelity. *Id.*, ¶ 11 & Ex. 6.

Based on these reports, it is evident that – even ***after*** Rocine received multiple letters about his confidentiality obligations to Fidelity and Defendants represented that Rocine understood such obligations – Defendants still possess Fidelity's trade secret customer information and are aggressively using it to unlawfully solicit Fidelity's customers. Bemmel Dec. ¶ 25. Moreover, Defendants' duplicitous conduct indicates Defendants' intent to continue using Fidelity's trade secret customer information in violation of federal and California law.[3] *Id.*, ¶ 26. Accordingly, absent immediate court intervention, Fidelity faces immediate and irreparable harm to its customer goodwill and trade secret customer information resulting from Defendants' actions. *Id.*, ¶ 28.

---

[3] Rocine's present efforts to poach clients that do not belong to him are consistent with how he behaved during his Fidelity employment, with respect to his Fidelity colleagues. Bemmel Decl., ¶ 23. For example, on May 26, 2016, Rocine received a written warning as a result of two incidents in which he attempted to add customers to his book of business when the customers were already actively engaged with other Fidelity representatives. *Id.*

LEWIS +
LLEWELLYN
LLP

**G.    Fidelity Faces The Threat Of Immediate And Irreparable Harm Stemming From Defendants' Conduct.**

Defendants' conduct has irreparably harmed and will continue to irreparably harm Fidelity if not immediately stopped. *Id.*, ¶¶ 28-29. Defendants' actions greatly threaten Fidelity's customer relationships and goodwill and, consequently, the potential revenue streams and referrals that such customers would provide to Fidelity absent Defendants' unlawful competition. *Id.*, ¶ 28. Moreover, by misusing Fidelity's confidential customer information – which includes highly sensitive, personally identifying information that is protected by federal financial regulatory law – Defendants' conduct has caused or threatens to cause Fidelity's clients to lose trust in Fidelity's ability to secure their privacy. *Id.*, ¶ 29. Indeed, Fidelity customers expect that their confidential information, such as their contact information, net worth, risk tolerances, investment goals, and preferences, will be protected and not misused by departing employees. *Id.* Thus, customers become (understandably) concerned when former Fidelity employees, such as Rocine, take their information and use it to solicit their business on behalf of a competitor. Perez Decl., ¶¶ 7, 11; Bemmel Decl., ¶ 29. The damage that Defendants have caused to Fidelity's customer relationships is ongoing and incalculable, as Fidelity cannot put a price on the value of its customer relationships or the damage Rocine caused when he misappropriated Fidelity's trade secret customer information on behalf of a competitor. Bemmel Decl., ¶ 29. Faced with Defendants' continuing use of its information to solicit Fidelity's customers, and the resultant irreparable harm caused to Fidelity, Fidelity is left with no alternative but to seek immediate redress from this Court and FINRA.[4]

<u>**LEGAL ARGUMENT**</u>

Fidelity is entitled to a TRO under the Defend Trade Secrets Act of 2016 ("DTSA"), the California Uniform Trade Secrets Act ("CUTSA"), and common law breach of contract. Defendants improperly, and without regard to the rights of Fidelity and its customers, used and

---

[4] Courts consistently grant TROs filed after plaintiffs' attempts to resolve the issues outside of court have failed. *See, e.g.*, *Fidelity Brokerage Servs. LLC v. McNamara*, 2011 WL 2117546, at *5 (S.D. Cal. May 27, 2011) (court granted Fidelity an *ex parte* TRO after Fidelity initially tried to resolve the issue with defendants without court intervention for three months).

LEWIS +
LLEWELLYN LLP

continue to use Fidelity's trade secret customer information to target, solicit, and attempt to divert Fidelity's customers to JPMorgan. Fidelity will be irreparably harmed if its goodwill and trade secrets are not protected. Fidelity is separately entitled to a TRO because Rocine is breaching his Employee Agreement with Fidelity. Accordingly, Fidelity seeks a narrowly-tailored TRO enjoining Defendants from using or disclosing Fidelity's trade secrets.

Courts in California routinely enjoin employees from using their former employers' customer information. *See*, *e.g.*, *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1079 (N.D. Cal. 2016); *Fidelity Brokerage Servs. LLC v. Nordstrom*, Case No. 17-0594 (Dkt. 26 at *2) (E.D. Cal. Mar. 30, 2017) (granting Fidelity's Motion for an *ex parte* TRO to protect *inter alia* customer information); *Fidelity Brokerage Servs. LLC v. McNamara*, No. 11 CV 1092 MMA RBB, 2011 WL 2117546, at *3 (S.D. Cal. May 27, 2011) (same). In addition, the DTSA expressly provides that a court may grant injunctive relief for either the actual or threatened misappropriation of trade secrets. 18 U.S.C. § 1836(b)(3)(A).

Fidelity vigorously protects its confidential and trade secret information. Since 2003, Fidelity has sought and obtained injunctive relief to protect its confidential and trade secret information in numerous similar cases, including two TROs granted by the United States District Court for the Central District of California, two TROs granted by the United States District Court for the Southern District of California, and a TRO granted by the United States District Court for the Eastern District of California.[5] As in those cases, a TRO should be issued here.

_____

[5] *See Fidelity Brokerage Servs. LLC v. Hoffman, et al.*, Case No. 1:17-CV-2831 (N.D. Ill. Apr. 19, 2017); *Fidelity Brokerage Servs. LLC v. Nordstrom*, Case No. 17-0594 (E.D. Cal. Mar. 30, 2017); *Fidelity Brokerage Servs. LLC v. Djelassi, et al.*, Case No. 2015-2337-BLS1 (Mass. Super. Aug. 11, 2015); *Fidelity Brokerage Servs. LLC v. Moore*, Case No. 2015-609-BLS1 (Mass. Super. Mar. 18, 2015); *Fidelity Brokerage Servs. LLC v. Hudson*, Case No. 4:14-CV-03229 (S.D. Tex. Nov. 18, 2014); *Fidelity Brokerage Servs. LLC v. Busch, et al.*, Case No. 14-10756 (E.D. Mich. Mar. 7, 2014); *Fidelity Brokerage Servs. LLC v. Clemens*, Case No. 2:13-CV-239 (E.D. Tenn. Nov. 4, 2013); *Fidelity Brokerage Servs. LLC v. Wilder*, Case No. 11-37296 (Mass. Super. Oct. 25, 2011); *Fidelity Brokerage Servs. LLC v. Fassenfeld*, Case No. 013945/11 (NY Sup. Ct. Sept. 28, 2011); *McNamara*, 2011 WL 2117546; *Fidelity Global Brokerage Grp. v. Beatty*, Case No. 652147 (NY Sup. Ct. Dec. 6, 2010); *Fidelity Global Brokerage Grp. v. Gray*, Case No. 10-1255 (E.D. Va. Nov. 9, 2010); *Fidelity Brokerage Servs. LLC v. Sanchez*, Case No. 08-03863 (C.D. Cal. 2008); *Fidelity*

LEWIS +
LLEWELLYN
LLP

**I.     THE STANDARDS FOR GRANTING TEMPORARY INJUNCTIVE RELIEF STRONGLY FAVOR GRANTING FIDELITY RELIEF.**

"The purpose of a temporary restraining order is to preserve the status quo pending the complete briefing and thorough consideration contemplated by full proceedings pursuant to a preliminary injunction." *Deck v. Wells Fargo Bank, N.A.*, 2017 WL 659945, at *1 (E.D. Cal. Feb. 13, 2017) (citation omitted).  The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *Id.* at *2.  The Ninth Circuit has also recognized the propriety of granting injunctive relief in aid of arbitration. *See*, *e.g.*, *Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire of N. Am., Inc.*, 609 F.3d 975, 980 (9th Cir. 2010) ("[T]he congressional desire to enforce arbitration agreements would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve the status quo pending arbitration and, *ipso facto*, the meaningfulness of the arbitration process.") (internal quotations and citations omitted).

Fidelity is entitled to injunctive relief because it can demonstrate:  (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to Fidelity in the absence of preliminary relief; (3) that the balance of the equities tips in its favor; and (4) that an injunction is in the public interest. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

---

*Brokerage Servs. LLC v. Franz*, Case No. 8/9564 (NY Sup. Ct. May 7, 2008); *Fidelity Brokerage Servs. v. Downey*, Case No. 08-1637 (JFB) (E.D.N.Y. Apr. 28, 2008); *Fidelity Brokerage Servs. v. Umstead*, Case No. 07-347 (E.D. Va. 2007); *Fidelity Brokerage Servs. v. Vance*, Case No. 07-1230 (C.D. Cal. 2007); *Fidelity Brokerage Servs. v. Stockwell*, Case No. 05-0455 (Mass. Super. 2005); *Fidelity Brokerage Servs. v. Rupp*, Case No. 05-00083 (D.N.H. 2005); *Fidelity Brokerage Servs. v. Jones*, Case. No. 04-3478 (S.D. Tex. 2004); *Fidelity Brokerage Servs. v. Parker*, Case No. 04-1027 (S.D. Cal. 2004); *Fidelity Brokerage Servs. v. Johnson*, Case No. A04-CA-662-SS (W.D. Tex. 2004); *Fidelity Brokerage Servs. v. Rousseaux*, Case No. 03-01319 (D. Md. 2003); *Fidelity Brokerage Servs. v. Donovan*, Case. No. 03-2286 (Mass Super. 2003); *Fidelity Brokerage Servs. v. Alexopoulos*, Case No. 03-5362 (Mass. Super. 2003).  In each instance, Fidelity successfully obtained a TRO to protect its confidential and trade secret information and to stop ongoing solicitation of its customers.

LEWIS +
LLEWELLYN LLP

## II.    FIDELITY HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.    Defendants Misappropriated Fidelity's Trade Secret Customer Information.

Fidelity is likely to succeed on its claims for misappropriation because Defendants have wrongfully retained or obtained, and are using, Fidelity's trade secret customer information to target and solicit Fidelity's customers.

Under both the DTSA and CUTSA, the Court can enjoin actual or threatened misappropriation of trade secrets.  18 U.S.C.A. § 1836(b)(3); Cal. Civ. Code. § 3426.2.  Trade secrets are defined by the DTSA as information that:

(1)    the owner thereof has taken reasonable measures to keep such information secret; and

(2)    the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).  CUTSA defines trade secrets similarly.  *See* Cal. Civ. Code. § 3426.1(d).

Courts in California have granted retail brokerage firms, such as Fidelity and others, the same relief that Fidelity seeks here.  *See, e.g.*, *Fidelity Brokerage Servs. LLC v. Nordstrom*, Case No. 17-0594 (E.D. Cal. Mar. 30, 2017); *Henry Schein, Inc.*, 191 F. Supp. 3d 1072, 1079 (N.D. Cal. 2016); *Fidelity Brokerage Servs. LLC v. McNamara*, No. 11 CV 1092 MMA RBB, 2011 WL 2117546, at *3 (S.D. Cal. May 27, 2011); *Wyndham Resort Dev. Corp. v. Bingham*, No. 2:10-CV-01556, 2010 WL 2740158 at *4-8 (E.D. Cal. July 9, 2010); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chung,* No. 01-659, 2001 WL 283083 at *4 (C.D. Cal. Feb. 2, 2001); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Garcia*, 127 F. Supp. 2d 1305, 13056 (C.D. Cal. 2000).

Indeed, under California law, "[a] violation of the UTSA occurs when an individual misappropriates a former employer's protected trade secret client list, for example, by using the list to solicit clients . . . ."  *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1155 (2004); *see also Henry Schein, Inc.*, 191 F. Supp. 3d at 1079-80 (granting TRO enjoining use of protected customer information for solicitation of business); *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1089-92 (E.D. Cal. 2012) (enjoining defendant from misappropriating trade secret customer information in

LEWIS +
LLEWELLYN LLP

violation of CUTSA); *Gable-Leigh, Inc. v. N. Am. Miss*, 2001 WL 521695, at \*20 (C.D. Cal. Apr. 13, 2001) (enjoining use of protected customer list).

### 1. Fidelity's Client Information Is A Trade Secret.

Fidelity's customer data qualifies as a trade secret under both the DTSA and CUTSA because the confidentiality of the data gives Fidelity an economic advantage over its competitors. California courts recognize that customer information can be found to "have economic value because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested."[6] *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (1997); *see also Henry Schein, Inc.*, 191 F. Supp. 3d at 1077 (customer information constituted trade secrets under both DTSA and CUTSA); *Pyro Spectaculars N., Inc.*, 861 F. Supp. 2d at 1090-91 (finding customer information was a trade secret where plaintiff required its employees to sign confidentiality agreements and use password-protected computers, and limited the availability of the data based on geographic region and job description); *Chung*, 2001 WL 283083, at \*4 (finding requirement of signing agreements prohibiting use or disclosure of customer information reasonable protection of a trade secret).[7]

---

[6] Fidelity's customer information, including the identity of Fidelity customers, is also required to be kept confidential under the Gramm-Leach-Bliley Act and its implementing regulations. The statute declares, "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a) (2012). The implementing regulation, known as Privacy of Consumer Financial Information (Regulation S-P), prohibits the disclosure of so-called "nonpublic personal information" to non-affiliated third parties without consent. 17 C.F.R. § 248.10. "Nonpublic personal information" is defined to include customer lists from financial institutions, *even if those lists contain only names of Fidelity customers* because the identity of an individual as being a customer of a particular financial institution is specifically protected by the federal regulations. 17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u)(2)(i)(D). Indeed, these regulations also protect a customer's account information. 17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u)(1).

[7] Additionally, Fidelity's information qualifies as a trade secret under the factors that California courts consider on this issue: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information;

---

LEWIS +
LLEWELLYN LLP

1    This is precisely the situation here.  Fidelity has spent millions to gather and protect its

2    confidential customer information.  And to ensure that Fidelity's valuable customer information

3    remains confidential, Fidelity, among other things, (a) password-protects all computers containing

4    customer information, (b) limits which employees have access to the passwords, (c) enforces a

5    Global Policy on Information Protection limiting use and access to customer information, (d)

6    reminds its employees periodically of the confidential and proprietary nature of its business

7    information, (e) enters into nondisclosure agreements with employees, and (f) performs exit

8    interviews on all departing employees during which it expressly reminds them of their

9    confidentiality agreements with Fidelity.  Peterson Decl., ¶ 9; Bemmel Decl., ¶¶ 6-9, 12, 14-15.

10    The value of Fidelity's customer information is underscored by the fact that Rocine

11    immediately used the information in his new role at JPMorgan, and has continued using the

12    information.  Permitting a competitor like JPMorgan unfettered access to this information would

13    give it a significant, unfair advantage over Fidelity in that the competitor could utilize the

14    information without having expended the necessary time and investment to compile the information.

15    Accordingly, Fidelity's customer information is a trade secret.

16

17

18

19

20

21

22
_____

23    (4) the savings effected and the value to the holder in having the information as against
24    competitors; (5) the amount of effort or money expended in obtaining and developing the
      information; and (6) the amount of time and expense it would take for others to acquire and
25    duplicate the information.  *Garcia*, 127 F. Supp. 2d at 1305; *Chung*, 2001 WL 283083, at *3.
      Generally, reasonable efforts have been held to include advising employees of the existence of a
26    trade secret, limiting access to a trade secret on a "need to know" basis, and controlling access.
      *Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1288 (1990); *see also MAI Sys.*
27    *Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993).  As demonstrated above, Fidelity
      easily satisfies all applicable factors.
28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
FIDELITY'S MOTION FOR TEMPORARY RESTRAINING ORDER

LEWIS +
LLEWELLYN
LLP

## 2.	Defendants Misappropriated Fidelity's Trade Secrets.

The DTSA defines "misappropriation" as *inter alia*:

[D]isclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy of the trade secret or limit the use of the trade secret . . . or derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret[.]

18 U.S.C. § 1839(5).  CUTSA's definition of misappropriation is similar Cal. Civ. Code § 3426.1(b).

"[M]isappropriation occurs if information from a customer database is used to solicit customers."  *Chung*, 2001 WL 283083, at *4; *see Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d at 1079-80 (enjoining defendant under the DTSA from using customer list to solicit clients at new employer).[8]

As described above, Defendants misappropriated Fidelity's trade secret information and are using it to solicit Fidelity customers in violation of the DTSA and CUTSA.  Absent misappropriation of Fidelity's trade secret customer information, Defendants could not have known which individuals among the general population are Fidelity customers and been able to target their marketing efforts directly at these individuals.

## 3.	Rocine Did More Than Announce; He Solicited Multiple Clients.

Even if a former employee were permitted to use a trade secret customer list to make "announcements" to the customers of a former employer, that exception would not apply to this case because solicitation (as distinguished from announcing a move) is prohibited under the DTSA and California law.  *See Reeves*, 33 Cal. 4th at 1156 (noting that "an individual may violate the UTSA by using a former employer's confidential client list to *solicit* clients") (emphasis in original); *see Henry Schein, Inc.*, 191 F. Supp. 3d at 1077 (holding that plaintiff alleged misappropriation of customer information under DTSA where defendant "sought to solicit and divert customers").

_____

[8] Moreover, California courts are unequivocal that trade secret information does not lose its status as a trade secret simply because an employee commits it to memory.  *See*, *e.g.*, *Courtesy*, 222 Cal. App. 3d at 1292.

LEWIS +
LLEWELLYN
LLP

While California law generally permits a departing employee to notify clients of his move to a new company, he "may not ask the clients for their business or otherwise solicit them to transfer their accounts[.]" *Fidelity Brokerage Servs. LLC v. McNamara*, No. 11 CV 1092 MMA RBB, 2011 WL 2117546, at *3 (S.D. Cal. May 27, 2011) (granting Fidelity temporary injunctive relief prior to FINRA proceedings); *Chung*, 2001 WL 283083, at *4 (holding that defendants improperly solicited former employer's customers by "placing direct and personal follow up calls to Merrill Lynch customers"). Here, like the defendant in *McNamara*, Rocine's conduct went far beyond a mailed announcement; it included repeated requests to transfer accounts to Fidelity's competitor, JPMorgan.

Defendants possess, have used, and continue to use Fidelity's confidential and trade secret information to benefit their new and competing business, in clear violation of the DTSA and CUTSA. Accordingly, Fidelity is likely to succeed on its misappropriation of trade secrets claims.

**B.     Rocine Breached The Employment Agreement.**

For the same reasons, articulated above, Fidelity has a strong likelihood of success on its breach of contract claim. To prevail on its claim for breach of contract, Fidelity need only establish (1) the existence of a contract, (2) its performance or excuse for nonperformance, (3) Rocine's breach, and (4) resulting harm to Fidelity. *Silicon Image, Inc. v. Analogix Semiconductor,* 642 F. Supp. 2d 957, 964 (N.D. Cal. 2008). Here, Pursuant to the Employee Agreement that Rocine signed as a condition of his initial and continuing employment, compensation, training, and access to Fidelity's trade secret customer information, Rocine agreed that he would not "copy, reproduce, use, disclose, or discuss in any manner . . . [Fidelity's] Confidential Information [(including its customer lists and customer information)]" outside of his Fidelity employment, and that he would not "retain any copies, notes, or excerpts of Confidential Information upon termination of [his] employment." Bemmel Decl., Ex. 3, ¶ 1. Rocine also agreed that he would not, for one year following his separation from Fidelity, use Fidelity's confidential information to "directly or indirectly, on [his] own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer or prospective customer of [Fidelity] to divert . . . [business away from Fidelity]." *Id.*, Ex. 3, ¶ 6. By taking Fidelity's confidential customer lists and information, and using that information to attempt to divert Fidelity's customers to JPMorgan,

LEWIS +
LLEWELLYN
LLP

1  Rocine has breached his Employment Agreement and caused harm to Fidelity.  Accordingly,

2  Fidelity is likely to succeed on its breach of contract claim.

3  **III.     FIDELITY IS SUFFERING IRREPARABLE HARM AS A RESULT OF**

4  **DEFENDANTS' WRONGFUL AND ONGOING ACTS.**

5  Defendants' misconduct has irreparably harmed Fidelity and will continue to irreparably

6  Fidelity if not stopped immediately.  *See Fidelity Brokerage Servs. LLC v. Nordstrom*, Case No. 17-

7  0594 (Dkt. 26 at *2) (E.D. Cal. Mar. 30, 2017) (granting Fidelity's Motion for an *ex parte* TRO and

8  finding "Fidelity will suffer irreparable harm if Defendants are permitted to continue to

9  misappropriate Fidelity's trade secret customer information and use that information to continue to

10 solicit Fidelity's customers").

11 Fidelity suffers irreparable harm through loss of both its trade secrets and its customer

12 goodwill, even among customers who have declined Defendants' solicitations to transfer and/or who

13 have reported being uncomfortable with Rocine's conduct and message.  Relatedly, Defendants'

14 theft and use of highly sensitive customer information threatens to cause Fidelity customers to

15 perceive that Fidelity does not protect the security of their confidential financial information.  For

16 instance, in *Fidelity Brokerage Services LLC v. McNamara*, the U.S. District Court for the Southern

17 District of California concluded that "[i]rreparable harm may be found, where as here, Defendants'

18 alleged actions may injure Fidelity's reputation if Fidelity's clients perceive a violation of their

19 confidential information."  2011 WL 2117546, at *6; *see also Bank of Am., N.A. v. Immel,* No. C 10-

20 02483 CRB, 2010 WL 2380877, at *3 (N.D. Cal. June 11, 2010) ("The Court concludes that

21 Plaintiff has shown a significant threat of irreparable harm if their client information is not returned.

22 If Defendants' conduct continues, Plaintiff will suffer harm to its reputation if it is perceived to have

23 violated or allowed the violation of its clients' confidential contact information."); *Gallagher Benefit*

24 *Servs., Inc. v. De La Torre*, 2008 WL 2512489, at *2 (9th Cir. 2008) ("declaration as to the goodwill

25 and customers that [plaintiff] would lose absent equitable relief supports [the district court's] finding

26 of irreparable injury"); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir.

27 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a

28 finding of possible irreparable harm.").  An injunction is required to prevent Fidelity customers from

LEWIS +
LLEWELLYN
LLP

losing confidence in Fidelity's ability to adequately protect their personal financial information.

When (as is the case here) there is compelling evidence that a former employee is in possession of customer information and soliciting his former employer's customers in violation of the DTSA and California law, California courts enjoin threatened future solicitation. *See*, *e.g.*, *Henry Schein, Inc*. 1079-80 (N.D. Cal. 2016) (enjoining defendant from "directly or indirectly, soliciting, continuing to solicit, initiating contact with, or accepting business from, any [of plaintiff's] customers whose accounts were assigned to her while she was employed by [plaintiff]."

## IV. THE EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR GRANTING THE REQUESTED INJUNCTIVE RELIEF.

### A. The Balance Of Equities Tips Strongly In Favor Of Fidelity.

The benefit of injunctive relief to Fidelity far outweighs any detriment to Defendants, and serves the public interest. An injunction would protect Fidelity's valuable trade secrets, goodwill, business reputation, methods of business operation, and contract rights. The reasoning of the *Chung* court is directly applicable to the present case:

> [T]he balance of hardships tips heavily in favor of granting injunctive relief because an injunction merely prohibits Defendants from misappropriating the trade secrets of [the plaintiff], and requires them to comply with the reasonable terms of their Agreements. An injunction will not prevent the Defendants from continuing their employment in the securities industry, will not interfere with their ability to acquire even a fairly limited number of clients of the thousands of potential clients in the area, or from working for [the new brokerage firm] in the community in which Defendants have chosen to work.

2001 WL 283083, at *6; *see also Pyro Spectaculars N., Inc.*, 861 F. Supp. 2d at 1092 ("[A]ny injunction issued would be focused on preventing defendant from unlawfully using PSI's trade secrets to solicit PSI's customers. Such an order would not cause any significant hardship to defendant, because it would essentially only require him to abide by existing law regarding the unauthorized use of another's trade secrets.").

### B. The Public Interest Will Be Served By Granting Injunctive Relief.

The public interest will be served by granting Fidelity's Motion because, without the requested injunctive relief, individuals such as Rocine will be free to misappropriate their former employers' trade secrets with impunity, and competing brokerage institutions will continue to recruit

LEWIS +
LLEWELLYN LLP

Fidelity employees who can share its confidential customer information, thereby shortcutting the time, effort and expense invested by Fidelity to build its clientele. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kramer,* 816 F. Supp. 1242, 1248 (N.D. Ohio 1992) ("To deny injunctive relief in this case would . . . jeopardize the integrity of the securities industry to the detriment of the public interest [and] . . . would cast doubt on the integrity of contractual agreements."). "On the one hand, California has a 'settled legislative policy in favor of open competition and employee mobility' . . . On the other hand, the state also has a strong policy in favor of protecting trade secrets." *Pyro Spectaculars N., Inc.*, 861 F. Supp. 2d at 1092 (citations omitted). In short, the requested relief will not negatively impact the public's interest in competition, and will protect Fidelity's trade secrets. *See Pyro Spectaculars N., Inc.*, 861 F. Supp. 2d at 1093 ("[F]ind[ing] that an injunction specifically focused on preventing misuse of PSI's trade secrets to solicit PSI's customers would serve the policy of protecting trade secrets while simultaneously allowing lawful competition."); *see also Immel*, 2010 WL 2380877, at *3 (California's strong public policy in favor of competition *yields* to California's interest in protecting a company's trade secrets); *Bank of Am., N.A. v. Lee*, 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008) (same).

## V.    A TRO WILL MAINTAIN THE *STATUS QUO* PENDING ARBITRATION.

A temporary restraining order is appropriate to preserve the *status quo* that existed as of the last peaceable act – immediately prior to the misappropriation of Fidelity's trade secrets and solicitation of Fidelity's customers. To preserve that *status quo*, a temporary restraining order should require Defendants to return all Fidelity data and to refrain from further solicitation of Fidelity customers for whom Rocine misappropriated or memorized data.

An order enjoining Defendants from misappropriating Fidelity's trade secret customer information and prohibiting solicitation of Fidelity customers would return the parties to the *status quo* without any undue prejudice to Rocine's ability to earn a living. *See, e.g.*, *McNamara*, 2011 WL 2117546 at *5; *Pyro Spectaculars N., Inc.*, 861 F. Supp. 2d at 1090-91; *see also Morlife, Inc.*, 56 Cal. App. 4th at 1528 ("In view of the clearly established violation of the UTSA, the injunction correctly draws the line, and leaves Burlingame free to solicit customers whose identities are not the trade secrets of Morlife.").

**VI.    THIS COURT MAY ENTER INJUNCTIVE RELIEF EVEN THOUGH THE MERITS WILL BE DECIDED IN ARBITRATION.**

Fidelity is entitled to injunctive relief from this Court pending FINRA arbitration. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano,* 999 F.2d 211, 214 (7th Cir. 1993); *Teradyne Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir. 1986); *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049 (2d Cir. 1990); *Ortho Pharm. Corp. v. Amgen Inc.*, 887 F.2d 460 (3d Cir. 1989); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1053-54 (4th Cir. 1985); *Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 777 F. Supp. 1349, *aff'd*, 948 F.2d 1286 (5th Cir. 1991); *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373 (6th Cir. 1995); *Peabody Coalsales Co. v. Tampa Elec. Co.*, 36 F.3d 46 (8th Cir. 1994); *PMS Distrib. Co. v. Huber & Suhner, A.G.*, 863 F.2d 639 (9th Cir. 1988); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dutton*, 844 F.2d 726 (10th Cir. 1988); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F. Supp 1555, 1561 (S.D. Fla. 1992), *aff'd*, 2 F.3d 405 (11th Cir. 1993) (per curiam).

In fact, under FINRA Rule 13804, Fidelity is ***required*** to seek and obtain immediate injunctive relief in a court of competent jurisdiction before an expedited FINRA arbitration is permitted to proceed. Thus, Fidelity's election to seek immediate injunctive relief from both FINRA and this Court is not only consistent, but is required under the FINRA Code of Arbitration Procedure.

**VII.   THERE IS NO NEED FOR A BOND.**

Although a bond is required under Federal Rule of Civil Procedure 65(c), the district court has wide discretion as to the amount. *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999). In fact, "[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003); *see Pyro Spectaculars N., Inc.*, 861 F. Supp. 2d at 1098 (same); *McNamara*, 2011 WL 2117546, at *8 (citing *Jorgensen*) (declining to issue bond requested by defendants).

Here, Fidelity has demonstrated an overwhelming likelihood of success on its claims and has made a clear showing of ongoing and irreparable harm. The requested injunctive relief will not

impede or prevent Defendants from conducting business. Rather, the requested injunctive relief will narrowly enjoin Defendants from continuing to unlawfully solicit Fidelity's customers and from retaining Fidelity's confidential and trade secret customer information. Accordingly, Fidelity respectfully requests that the Court either dispense with the bond requirement or, at most, require a nominal bond.

<b><u>CONCLUSION</u></b>

For all the foregoing reasons, Fidelity respectfully requests that the Court grant Fidelity's motion and issue the requested injunctive relief in accordance with the Proposed Order submitted concurrently herewith.

Dated: August 30, 2017

Respectfully submitted,

LEWIS & LLEWELLYN LLP
Marc R. Lewis
Ryan B. Erickson

BECK REED RIDEN LLP
Russell Beck
Stephen D. Riden

By: */s/ Ryan B. Erickson*
Ryan B. Erickson
Attorneys for Plaintiff
FIDELITY BROKERAGE SERVICES LLC

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
FIDELITY'S MOTION FOR TEMPORARY RESTRAINING ORDER

LEWIS +
LLEWELLYN
LLP