UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FIDELITY BROKERAGE SERVICES LLC,

    Plaintiff,

  v.

BRETT ROCINE, et al.,

    Defendants.

Case No. 17-cv-4993-PJH

**ORDER GRANTING APPLICATION FOR TEMPORARY RESTRAINING ORDER**

Plaintiff's application for a temporary restraining order ("TRO") came on for hearing before this court on September 6, 2017. Plaintiff appeared by its counsel Russell Beck and Ryan Erickson, and defendant Brett Rocine appeared by his counsel Andrew Hutchison and Leonard Weintraub. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS the application as follows.

**BACKGROUND**

Plaintiff Fidelity Brokerage Services LLC ("Fidelity") filed the complaint in this action on August 28, 2017, asserting two claims of misappropriation of trade secrets, plus claims of breach of contract, tortious interference with employment agreement, unjust enrichment, and injunctive relief, against defendants Brett Rocine ("Rocine") and J.P. Morgan Securities LLC ("JPMorgan").

Rocine worked as a Financial Consultant at Fidelity's Larkspur, California, office from October 2014 until July 20, 2017. He now works at JPMorgan in its Mill Valley, California, office, as a Vice President, Private Client Advisor. JPMorgan and Fidelity are

direct competitors. Complaint ("Cplt") ¶¶ 3, 4, 6; Declaration of Peter Van Bemmel in support of TRO application ("Van Bemmel Decl.") ¶ 3.

Fidelity provides its customers a variety of financial services, including financial planning, retirement services, wealth management, securities execution and clearing, and life insurance services. Cplt ¶ 19. Unlike most other retail brokerage companies, Fidelity does not have its Account Executives, including its Financial Consultants, make "cold calls" to prospective customers who have no established relationship with Fidelity. Cplt ¶ 20.

Instead, Fidelity requires its Financial Consultants to develop service relationships based on leads that Fidelity provides, primarily prospective customers who have initiated contact with Fidelity, or existing customers who have experienced a "triggering event" such as a Fidelity 401(k) distributable event. Cplt ¶¶ 20-22. This lead-based approach to supporting its Financial Consultants distinguishes Fidelity from other full-service brokerages where individual brokers, rather than the firm, are responsible for establishing customer relationships. Cplt ¶ 23.

Fidelity requires each employee to execute a standard Fidelity Employee Agreement in which the employee agrees not to use or disclose Fidelity's confidential information, including customer information. Cplt ¶ 7; Van Bemmel Decl. ¶¶ 8-9. Rocine signed the Employee Agreement at the inception of his employment in 2012. Cplt ¶¶ 31-34 & Exh. 1; Van Bemmel Decl. ¶ 8.

The Agreement defines "Confidential Information" as including "all information not generally known to the public at the time made known to the Employee," which in turn includes "trade secrets," "customer, prospect, vendor, and personnel lists," and "financial and other personal information regarding customers and employees." Cplt Exh. 1 at ¶ 1. The Agreement also includes a "Non-solicitation" provision, which prohibits an employee during his/her time of employment, and for one year thereafter, from using "Confidential Information" to solicit any Fidelity client to move his/her business away from Fidelity. Cplt Exh. 1 ¶ 6.

Mr. Van Bemmel, Rocine's former supervisor, met with Rocine before Rocine departed from Fidelity on July 20, 2017, and reminded him of his obligation not to use or disclose Fidelity's confidential customer information. Cplt ¶¶ 5, 38; Van Bemmel Decl. ¶ 12. In addition, on July 29, 2017, Fidelity sent Rocine a "separation letter," in which it again reminded Rocine of his obligation not to use Fidelity's confidential information and trade secret customer data, which Fidelity does not disclose to competitors and which it protects using various safeguards. Cplt ¶¶ 25-30, 40-41 & Exh. 5; Van Bemmel Decl. ¶ 14.

Beginning in late July, Fidelity began receiving reports that Rocine had been calling Fidelity's clients in an effort to divert their accounts to JPMorgan. Cplt. ¶ 43; Van Bemmel Decl. ¶ 13; see also Declaration of Jess Perez ("Perez Decl.") ¶ 4. Fidelity asserts that Rocine has been using names and contact information he obtained while working at Fidelity. Cplt ¶ 43.

After Fidelity learned about this, it sent Rocine a cease-and-desist letter on August 7, 2017, reminding him he was not permitted to use Fidelity's confidential customer information, including clients' names, addresses, telephone numbers, or account information. Cplt ¶¶ 8, 43 & Exh. 6; Van Bemmel Decl. ¶ 15. Fidelity also requested that Rocine return any confidential information in his possession. Cplt ¶ 43; Van Bemmel Decl. ¶ 15.

Although Rocine did not respond to the letter, JPMorgan did respond, by email on August 9, 2017, advising Fidelity that Rocine was aware of his obligations, and stating that "Mr. Rocine assures us that he did not retain a client list or any other confidential documents or property from Fidelity." Cplt ¶¶ 44, 45 & Exh. 7; Van Bemmel Decl. ¶ 16 & Exh. 7. Fidelity asserts, however, that notwithstanding JPMorgan's assurances, it has received reports directly from its customers that Rocine has been soliciting them to transfer their accounts to JPMorgan. Cplt ¶ 46; Van Bemmel Decl. ¶¶ 17, 18.

According to Fidelity, over the period July 31, 2017, to August 22, 2017, at least six different Fidelity clients reported that Rocine had contacted them and solicited them to

move their accounts to JPMorgan.  Cplt ¶¶ 47-53 (citing reports by Fidelity customers identified as "EC," "GP," "PS," "KM," "GN," and "AN"); see also Van Bemmel Decl. ¶¶ 20-23 & Exhs. 7-8; Supp. Van Bemmel Decl. ¶ 3-7 & Exh. 1; Perez Decl. ¶¶ 5-11 & Exhs. 1-6.  Fidelity contends that Rocine could not have known of the existence of these customers unless he took confidential information with him when he left Fidelity.  Cplt ¶ 54; Van Bemmel Decl. ¶¶ 13, 27.

Fidelity filed the complaint in the present action on August 28, 2017, asserting six causes of action – misappropriation of trade secrets (under both the Defend Trade Secrets Act of 2016 ("DTSA") and the California Uniform Trade Secrets Act ("CUTSA")), against both JPMorgan and Rocine; breach of contract, against Rocine; tortious interference with employment agreement, against JPMorgan; unjust enrichment, against Rocine; and injunctive relief, against both defendants.

Fidelity, JPMorgan, and Rocine are subject to the arbitration rules and regulations of the Financial Industry Regulatory Authority ("FINRA"), pursuant to FINRA Rule 13200. Cplt ¶ 11.  Although this dispute will ultimately be decided in binding arbitration before FINRA, pursuant to FINRA Rule 13804, Fidelity is required to seek and obtain immediate injunctive relief in a court of competent jurisdiction before an expedited FINRA arbitration can proceed.  Cplt ¶ 11.

Fidelity asserts that once a restraining order is issued by this court, an expedited arbitration can be scheduled with FINRA within 15 days of the entry of the TRO.  Cplt ¶ 11.  If no TRO is issued, the FINRA arbitration cannot proceed on an expedited basis, and will instead be assigned to a standard-track arbitration, which Fidelity contends might not take place for a year or more.  Cplt ¶ 11.

**DISCUSSION**

A.   Legal Standard

Federal Rule of Civil Procedure 65 provides federal courts with the authority to issue temporary restraining orders and preliminary injunctions.  Fed. R. Civ. P. 65(a), (b). Generally, the purpose of a preliminary injunction is to preserve the status quo and the

rights of the parties until a final judgment on the merits can be rendered, see U.S. Philips Corp. v. KBC Bank N.V., 590 F.3d 1091, 1094 (9th Cir. 2010), while the purpose of a temporary restraining order is to preserve the status quo before a preliminary injunction hearing may be held. See Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers, 415 U.S. 423, 439 (1974)).

Requests for temporary restraining orders are governed by the same general legal general standards that govern the issuance of a preliminary injunction. See New Motor Vehicle Bd. v. Orrin W. Fox Co., 434 U.S. 1345, 1347 n.2 (1977); Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001).

An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008); see also Munaf v. Geren, 553 U.S. 674, 689-90 (2008). A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).

A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. Winter, 555 U.S. at 20. Alternatively, the plaintiff may demonstrate that the likelihood of success is such that "serious questions going to the merits were raised and that the balance of hardships tips sharply in the plaintiff's favor," so long as the other two elements of the Winter test are met. Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-32 (9th Cir. 2011).

B.   Fidelity's Application for a TRO

Fidelity seeks a TRO enjoining both JPMorgan and Brett Rocine from using, disclosing, transmitting, and continuing to possess, for any purpose, including to solicit any customer or prospective customer of Fidelity, the information contained in the records of Fidelity, including but not limited to the names, addresses, telephone numbers,

5

email addresses, and confidential financial information of any customers Rocine learned of through his employment with Fidelity.

Fidelity argues that it is entitled to injunctive relief because it can demonstrate a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest.

1. Likelihood of success on the merits

Fidelity first contends that it has a strong likelihood of success on the merits, because it has demonstrated that defendants misappropriated Fidelity's trade secret information, and that Rocine breached the Employment Agreement by using Fidelity's "Confidential Information" to solicit Fidelity's customers. Fidelity cites to the declarations and other evidence supporting its claim that Rocine repeatedly contacted his former clients at Fidelity to solicit their business on behalf of JPMorgan.

In opposition, Rocine contends that he did not misappropriate any Fidelity confidential or trade secret information. He claims that he took nothing with him when he left Fidelity – no client list, and no other documents or information, including contact information, account numbers, account balances, or social security numbers. Declaration of Brett Rocine ("Rocine Decl.") ¶¶ 5-6.

Rocine asserts that after joining JPMorgan, he "made a list from memory of a small number" of his former clients at Fidelity, because he wanted to inform them that he had moved to JPMorgan, Rocine Decl. ¶ 9, which he contends is not an improper solicitation. He claims that the list contained approximately 25-30 names of his former Fidelity clients (out of approximately 1,000 clients he serviced while he was at Fidelity). Id.

Rocine claims that after creating this list (from memory), he searched the JPMorgan computer system to try to obtain their contact information, in the event they were also JPMorgan clients. Id. He asserts that "virtually all" the Fidelity clients he looked up on the JPMorgan system also had "some type of account" at JPMorgan. Id.

6

1    For "the few" Fidelity clients who he did not locate in the JPMorgan system, he searched
2    publicly-available databases for those names, and was able to find contact information
3    (phone numbers) for all of them.  Id.

4    Rocine claims he then called the approximately 25-30 Fidelity customers to let
5    them know he had left Fidelity and was working at JPMorgan.  Rocine Decl. ¶ 10.  He
6    asserts that he spoke with only 15-20 of those former clients, and left voicemail
7    messages for the rest.  Id.  He contends that he did not initiate further calls to any of
8    those former clients if they did not contact him or ask him to call them.  Id.  He claims that
9    beyond those 25-30 former Fidelity clients, he has not contacted any of the remaining
10   approximately 1,000 clients he serviced while at Fidelity.  Rocine Decl. ¶ 11.

11   As for the allegations regarding the six Fidelity customers who allegedly claim that
12   Rocine contacted them repeatedly and tried to persuade them to move their accounts to
13   JPMorgan, Rocine denies that he left multiple messages or solicited any business.
14   Rocine Decl. ¶¶ 14-20.  He contends that he has a "strong relationship" with one of the
15   Fidelity clients that he contacted, and that that person has called him several times
16   wanting to know more about his new job at JPMorgan, and that the two of them had
17   lunch one time in August.  Rocine Decl. ¶ 18.

18   Rocine also argues as a general proposition that customer lists and general
19   customer information do not necessarily constitute trade secrets, because information is
20   not a trade secret when it is readily ascertainable through public sources.  His counsel
21   argued further at the hearing that Fidelity's customer lists cannot be protectable trade
22   secrets if, as provided in the Employment Agreement, a departing Fidelity employee is
23   barred from using such information to solicit business for only one year after leaving
24   his/her employment at Fidelity.

25   The court finds it unnecessary to determine whether the information regarding
26   Fidelity's customers constitutes trade secrets, because it finds that Fidelity has
27   established a likelihood of success on the merits as to the claim of breach of contract.
28   Rocine does not dispute that he is bound by the Employee Agreement, which prohibits

him from using Fidelity's "Confidential Information" to solicit any Fidelity client to move his/her business away from Fidelity for a period of one year following his departure from Fidelity.

At the hearing, Rocine's counsel attempted to argue that nothing precludes Rocine from soliciting his former Fidelity clients, and also asserted that he has not solicited anything from any former client. The court is persuaded, however, that the contemporaneous notes of customer calls maintained by Fidelity, which are supported by Mr. Perez's descriptions of his conversations with those customers, plus the recording of the customer voice-mail which was played by Fidelity's counsel at the hearing, provide sufficient support for Fidelity's claim that Rocine used Fidelity's "Confidential Information" to solicit its customers.[1]

The court finds it disingenuous, at best, for Rocine to claim that he did not "use" Fidelity's "Confidential Information" to solicit Fidelity's customers because all he did after his departure was put together a list of customers "from memory" and then look up their contact information in JPMorgan's account databases or in publicly-available databases. The fact remains that he would not have known whose name to look up had he not first obtained the names during the course of his employment at Fidelity.

2.   Irreparable harm

Next, Fidelity argues that it has established a likelihood of irreparable harm as a result of defendants' wrongful and ongoing acts. Fidelity claims that is has suffered and is suffering irreparable harm through loss of both its confidential information (including trade secrets) and its customer goodwill, even among customers who have declined defendants' solicitations to transfer and/or who have reported being uncomfortable with

---

[1] Rocine argues that the reports of customer calls are hearsay, and thus inadmissible. In general, however, because of the urgency involved, and the limited time that TROs remain in effect, declarations and evidence supporting an application for a TRO need not conform to the standards for a summary judgment motion or the Federal Rules of Evidence. See Schwarzer, et al., Fed. Civ. P. Before Trial (2017 ed.) § 13:105 (citing Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009); Flynt Distrib. Co., Inc. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984)).

8

Rocine's conduct and message.

Fidelity contends that defendants' theft and use of highly sensitive customer information threatens to cause Fidelity customers to perceive that Fidelity does not protect the security of their confidential financial information. Fidelity cites to comments made by some of the customers Rocine contacted, who reported, for example, that they were concerned about the protection of their private financial information or that they perceived Rocine's actions as "unprofessional."

In opposition, Rocine argues that Fidelity cannot demonstrate that it faces any prospect of irreparable harm. Rocine asserts that more than two months have passed since his departure from Fidelity, without a single Fidelity client having moved his/her account from Fidelity to JPMorgan. See Rocine Decl. ¶ 12. Thus, he argues, it is difficult to tell what "irreparable harm" Fidelity will suffer if no injunction issues, and in particular, it is unclear what "status quo" Fidelity is seeking to have altered by an injunction.

In addition, Rocine argues, a temporary loss of income, or any money damages, is not sufficient to constitute "irreparable harm." He contends that the threatened injury is amenable to mathematically precise computation – for each customer that leaves Fidelity for JPMorgan, the trade lost by Fidelity can be calculated. Rocine argues that such amounts cannot constitute irreparable harm.

The court finds that Fidelity has shown the likelihood of significant irreparable harm if Rocine is not enjoined from using its client confidential information, at least until the merits of Fidelity's claim have been resolved in the FINRA arbitration. While Rocine is correct that monetary injury alone is not "irreparable," see Sampson v. Murray, 415 U.S. 61, 90 (1974), Fidelity has also made a showing of a likelihood of harm that may be truly irreparable. For example, if Rocine continues to pursue business from his former Fidelity clients, Fidelity will suffer harm to its reputation if it is perceived to have violated or allowed the violation of its clients' confidential contact information. See Stuhlbarg, 240 F.3d at 841 ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of possible irreparable harm.").

### 3. Balance of hardships and public interest

Finally, Fidelity argues that both the balance of equities and the public interest strongly favor granting the requested injunctive relief. Fidelity claims that the benefit of injunctive relief far outweighs any detriment to defendants, as an injunction would protect Fidelity's valuable trade secrets, goodwill, business reputation, methods of business operations, and contract rights. Fidelity asserts that any injunction would be focused on preventing defendants from using Fidelity's confidential information, and such an order would not cause significant hardship to defendants because it would only require them to comply with existing law.

In response, Rocine contends that balancing the risks of harm dictates denial of an injunction. He claims that he would face a "profound injury" were an injunction to be issued – because an injunction would "effectively inhibit his clients from doing business with him" – and that by contrast, Fidelity will suffer no irreparable harm if an injunction is denied.

Fidelity also contends that the public interest will be served by granting injunctive relief, because without injunctive relief, individuals such as Rocine will be free to misappropriate their former employer's confidential information with impunity, and competing brokerage institutions will continue to recruit Fidelity employees who can share its confidential customer information.

In response, Rocine argues that issuance of an injunction would be "significantly injurious" to the public, because he has clients who wish to continue to do business with him. He contends that the clear public interest in allowing individuals to continue to receive services of their established and trusted investment advisor mandates denial of plaintiff's request for injunctive relief.

The court finds that the balance of hardships and the public interest both favor the issuance of a TRO. Rocine's argument is essentially that the issuance of a TRO will harm him because it will interfere with his ability to service those clients who might wish to transfer their accounts to JPMorgan. However, nothing in the TRO precludes Rocine

10

from sending his former clients a written announcement regarding his move to JPMorgan, and nothing will preclude Fidelity customers from transferring their accounts to JPMorgan. What the TRO bars is the use by Rocine of Fidelity's customer information – whether that information is stored in his brain or located elsewhere – to solicit customers to transfer their accounts.

## CONCLUSION

In accordance with the foregoing, the court hereby GRANTS Fidelity's application for a TRO. With regard to the question concerning the duration of the TRO, the court notes that while a TRO issued <u>without notice</u> expires automatically within the time set in the order, not to exceed 14 days, and may be extended for another 14 days "for good cause" or by consent of both parties, Fed. R. Civ. P. 65(b)(2), there is no time limit or other requirements clearly set in the Federal Rules for the court to set the hearing on the motion for preliminary injunction where the TRO was issued <u>with notice</u>. <u>See</u> Schwarzer, et al., § 13:126. Accordingly, the duration of the TRO will be 14 days, with an extension of 14 days, or 28 days, to allow for the dispute to be submitted for arbitration.[2]

Within that 28 days, Fidelity must initiate the FINRA arbitration and determine whether a motion for a preliminary injunction will be filed. Given that a preliminary injunction would, if granted, preliminarily adjudicate the merits of a dispute whose merits will be decided in an arbitral forum rather than by this court, the court sees no utility in scheduling a hearing for such a motion. The parties shall meet and confer and advise the court what if any further action they contemplate in this court.

The court ORDERS as follows:

1. Effective immediately, defendants are enjoined from, either directly or indirectly, and whether acting alone or in concert with others, using, disclosing,

---

[2] Regardless of the fact that Rule 65 does not clearly address the duration of a TRO issued with notice, the court finds, based on the nature of the relief provided, that a TRO cannot be extended indefinitely, even upon notice and hearing. Thus the court issues the TRO for the maximum duration specified under Rule 65(b)(2). <u>See</u> Schwarzer, et al., § 13:133.

11

1 transmitting, and continuing to possess for any purpose, including to solicit, induce, or attempt to induce any customer or prospective customer of Fidelity, the information contained in the records of Fidelity, including, but not limited to, the names, addresses, telephone numbers, email addresses and confidential financial information of the customers Rocine learned of through his employment with Fidelity;

2. Defendants, and anyone acting in concert with them, including any agent, employee, officer or representative of JPMorgan, or any other business for which Rocine performs services, shall return to Fidelity all records, documents and/or information pertaining to Fidelity customers, whether in electronic, handwritten or any other form within five (5) days of entry of this order, including any and all copies. This requirement includes all records or documents, in any form, created by defendants, including documents created from memory, or anyone acting in concert with them, based on documents or information that was received or removed from Fidelity by Rocine;

3. Rocine shall file a declaration attesting that he has returned to Fidelity all information subject to this order within seven (7) days from the date of entry of the order;

4. JPMorgan shall file a declaration attesting that it has returned to Fidelity all information subject to this order within seven (7) days from the date of entry of the order;

5. Pursuant to the requirements of sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 3-4, the parties will proceed to an expedited arbitration hearing on the merits before a duly appointed panel of arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure;

6. This order is effective immediately and does not require the posting of an injunction bond.

**IT IS SO ORDERED.**

Dated: September 7, 2017

_____
PHYLLIS J. HAMILTON
United States District Judge